IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| **TOREY FITZGERALD, KENNETH MCCOY, and ALAN MOORE**, individually and on behalf of all others similarly situated, | ) ) ) ) | **Civil Action No. 2:17-cv-02251** |
| **Plaintiff,** | ) | **DISTRICT JUDGE MAYS** **MAGISTRATE JUDGE CLAXTON** |
| v. | ) ) | |
| **P.L. MARKETING, INC.,** | ) ) | |
| **Defendant.** | ) ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT AGREEMENT**

Plaintiffs Torey Fitzgerald ("Representative Plaintiff," or "Plaintiff Fitzgerald"), Kenneth McCoy ("Kentucky Class Plaintiff" or "Plaintiff McCoy"), and Alan Moore ("Ohio Class Plaintiff" or "Plaintiff Moore"), on behalf of themselves and the members of the Settlement Classes ("Class Members"), hereby move the Court for final approval of the Class Action Settlement Agreement ("Settlement Agreement" or "Settlement") between Plaintiffs and Defendants pursuant to Fed. R. Civ. P. 23(e). Plaintiffs further support this joint motion for final approval with Plaintiffs' Unopposed Motion for Final Approval of Attorney's Fees, Costs, and Service Payments, filed contemporaneously herewith.

## I.  BACKGROUND AND SUMMARY OF CLAIMS AT ISSUE

17.    Defendant P.L. Marketing, Inc. ("Defendant" or "PLM") is a vendor by contract with The Kroger Co. ("Kroger"), its only client, to provide in-store merchandise display work in Kroger's grocery stores, involving merchandise placement and tagging on shelves and displays. (Declaration of C. Andrew Head ("Head Decl."), ¶ 17). This case involves only one subset of Defendant's in-store merchandising services: store "sets" or "resets," involving setting product and pricing on each assigned Kroger store's shelving and displays, performed by Set/Reset Team Members ("STMs") or Set/Reset Team Leads ("STLs") during any period(s) of time within the

applicable limitations periods when Defendant paid those positions as salaried and exempt from federal and state overtime laws. *Id.*

Plaintiff Fitzgerald filed his collective action Complaint on March 13, 2017 (ECF No. 1), alleging that the STM and STL positions were at all times non-exempt, but Defendant classified and paid the STM position (until it was reclassified to hourly non-exempt beginning December 5, 2016) and the STL position (which has not been reclassified) as salaried exempt.

Pursuant to a Tolling Agreement executed between the parties on September 22, 2017, which tolled the federal and state law overtime claims arising out of set/reset work for all individuals who file opt-in Consents in the case and contemplated addition of state law class claims by amendment to the pleadings, Plaintiffs filed an Amended Complaint adding Kentucky and Ohio class claims which were deemed, for purposes of calculating the applicable statutes of limitations, as having been filed on August 18, 2017. (Head Decl., ¶ 19) In response, Defendants denied all allegations of wrongdoing and denied liability.

The Parties engaged in extensive exchanges of information about the claims including (1) job descriptions for the positions at issue, (2) Defendant's personnel policies, including policies regarding travel, mileage reimbursement, and car allowance, (3) personnel files for Plaintiff Fitzgerald and each of the opt-in Plaintiffs who opted in prior to notice being issued, (4) documents reflecting dates in the relevant positions for each of the opt-in plaintiffs and Ohio and Kentucky class members, (5) documents regarding the based-in state for each individual working in a relevant position during the applicable time period, (6) documents regarding time recorded as worked by each of the opt-in STMs and STLs in the Kroger stores which they were only required to record for approximately thirteen months of the maximum three-year lookback recovery periods until the December, 2016 reclassification and were only recorded as to their in-store hours worked, (7) documents regarding time recorded by the STMs after the December, 2016 reclassification, which included data of compensable travel time recorded as worked and paid by Defendant, (8) payroll records, including mileage reimbursement, car allowance, and bonuses for each of the opt-

in plaintiffs for the entire relevant time period, and (9) mileage reimbursement records for the named Plaintiff and each of the opt-in Plaintiffs who opted-in prior to notice. *Id.*, ¶ 20.

Because the majority of the data was not entered, recorded, monitored or maintained for the purposes of recording actual hours worked for payroll at the time of data entry, it presented multiple difficulties which Plaintiffs thoroughly analyzed, identifying numerous data issues, gaps, discrepancies, and omissions, and applied assumptions and extrapolations to solve for missing and/or unreliable data periods or categories. *Id.*, ¶ 21.

The parties then engaged in a full-day mediation with nationally recognized mediator Allen Blair on May 8, 2018. It did not result in settlement, and instead revealed that the difficulties with the workability of the data had caused the parties to reach vastly different conclusions regarding average in-store set/reset hours and compensable travel time hours supported by the data. The Parties then agreed to each retain experts to analyze the data and draw conclusions and extrapolations sufficient to determine the expert's calculation of damages exposure models – and to review the opposing expert's calculations and methodology. *Id.*, ¶ 22.

Plaintiffs retained nationally recognized data, statistical, and wage and hour damages modeling expert David Breshears, CPA/CFF of Hemming Morse, LLP.[1] Plaintiffs' expert conducted full and independent analysis of the raw data produced by Defendant, and did extensive work solving for problematic data issues such as duplicate lines of data, double counting of PTO, inconsistent use of columns and cells, correcting for lines incorrectly as "out of class" due to inconsistent use of File numbers as text instead of numbers, data production that did not match the specific workweeks when Plaintiffs worked in the covered positions, erroneous labeling of weeks, use of two different styles of payroll files one of which had alternative column names and additional columns, adjusting the "In class" list multiple times for corrections based on data

---

[1] *See* website bio: http://www.hemming.com/profile/32/David_M_Breshears.html; *see also Strauch v. Comput. Scis. Corp.*, No. 3:14-CV-956 (JBA), 2018 U.S. Dist. LEXIS 192713, at *25-26 (D. Conn. Nov. 9, 2018) (expert report from David Breshears retained to "fill[] the[] gaps by drawing certain inferences about how to interpret Defendant's timekeeping data, and … calculate[e] damages based on Defendant's data and inferences drawn from the data.").

received including mismatched ID numbers, incorporation of additional payroll data later received by supplemental production and eliminating duplication, and similar data reliability and inconsistency issues. After completing his analysis of the data produced and applying his assumptions and extrapolations for periods or data not accurately reliably recorded, Plaintiffs' expert calculated damages exposure models for the entire period. *Id.*, ¶ 23.

At the conclusion of that long and involved process of data and damages analysis by each side's experts, the Parties and their experts jointly conferred to review each expert's conclusions and methodology. Although some differences were identified, the Parties were generally able to conclude that each expert's ultimate damages models were not more than approximately $100,000 apart. The Parties then engaged in a second day of the continued mediation with Allen Blair on July 10, 2019, which concluded after 7:30 p.m. by acceptance of a mediator's proposal as to the total settlement fund amount. *Id.*, ¶ 24.

In the months that followed, the Parties continued to negotiate the language of the Settlement Agreement, and worked collaboratively to resolve issues that arose with Defendant's concerns about settlement logistics due to Defendant's status as an employee-owned entity through an Employee Stock Ownership Plan ("ESOP"). *Id.*, ¶ 25. Through the entire mediation process, which required additional negotiations with the assistance of the mediator after the first in-person mediation concluded without an agreement, the Parties eventually reached a settlement in which both sides compromised their positions in order to avoid the expense and uncertainty of continued litigation. *Id.*

## II.  THE SETTLEMENT AND MONETARY/NON-MONETARY BENEFITS TO CLASS

The Parties' Settlement and Release Agreement (the "Settlement Agreement") was attached to the Parties' preliminary approval motion as Exhibit A [ECF No. 88-1]. The Parties agree and submit that the terms and conditions of the settlement are fair, reasonable, and in the best interest of the Parties.  The Parties entered into the Settlement Agreement because it reflects a reasonable compromise of the Parties' disputed issues and any actual or potential claims.

Under the terms of the Settlement Agreement, Defendant will deposit the Total Settlement Amount into a Qualified Settlement Fund ("QSF") administered by the Settlement Administrator, RG/2 Claims ("Settlement Administrator" or "RG/2"), from which all Court-approved attorney's fees and costs, Settlement Administrator's costs, and service awards will be paid, and against which net amount remaining after those payments ("Net Settlement Fund") the individual plaintiffs will receive their settlement shares. *Id.*, ¶ 26. No amount of the Settlement Fund will revert to Defendant. *Id.*, ¶ 27. In addition to the Representative Plaintiff (Torey Fitzgerald) there are 161 FLSA collective action members who filed Consents to join for the relevant period, 48 total Kentucky settlement class action members (of which 20 have already joined the case as opt-ins, leaving 28 absent Kentucky class members), and 35 total Ohio settlement class action members (of which 14 already joined the case as opt-ins, leaving 21 absent Ohio class members). *Id.*, ¶ 28.

The net settlement payments to the Plaintiffs and class members, after deduction for all requested amounts for fees, costs, administration, and service payments, constitute approximately 320% of Plaintiffs' total potential back wages if calculated using Defendant's preferred half-time methodology for the maximum possible statutes of limitation, and 100% of Plaintiffs' total potential back wages using Plaintiffs' preferred time-and-a-half methodology for that same period, based on hours worked determined by Plaintiffs' expert's analysis of and extrapolations from the in-store and travel time averages indicated by the data. *Id.*, ¶ 28.

The Settlement Agreement provides for settlement-purposes-only final certification of the following collective and class actions: (i) a FLSA collective action for all individuals who opt-in to the litigation who worked as STMs or STLs paid as exempt from the earlier of (a) three years preceding the earlier of the filing date of their Consent in the Action, or (b) three years preceding the Tolling Agreement effective date, through July 10, 2019 (the final "collective action"); (ii) a class action under Kentucky's overtime statute, Kentucky Revised Statute § 337.010 et seq., that includes the claims of those individuals for weeks worked as Kentucky-based STMs paid as exempt from the date five years preceding the Tolling Agreement effective date through the December 4, 2016 pay date (the "Kentucky class action") pursuant to the applicable five year

statute of limitations, and (iii) a class action under Ohio's overtime statute, O.R.C. § 4111.01, that includes the claims of those individuals for weeks worked as Ohio-based STMs paid as exempt from the date two years preceding the Tolling Agreement effective date through the December 4, 2016 pay date, pursuant to the applicable two year statute of limitations under O.R.C. § 2305.11(A) (the "Ohio class action"). *Id.*, ¶ 29.

For the FLSA claims, each plaintiff who joined the case, and each absent KY or OH class member who chooses to opt in to the settlement to accept their offered FLSA Payment will receive a portion of the Net Settlement Fund amount allocated to settlement of FLSA claims as set forth in the Settlement Agreement based on the number of workweeks worked by each plaintiff for which workweek the individual was paid as exempt from applicable overtime laws on a pay date within the period beginning three years preceding the earlier of (a) three years preceding the earlier of the filing date of their Consent in the Action, or (b) three years preceding the Tolling Agreement effective date, through July 10, 2019, at different valuation calculations that appropriately account for (i) whether the individual joined the action and locked in their participation in the FLSA collective action prior to settlement, appropriately weighting FLSA claims by the 162 current opt-in FLSA collective members higher than claims for absent Kentucky Class and Ohio Class members who did not opt in to the Litigation during the original notice period; (ii) the non-FLSA Collective member absent Kentucky Class or Ohio Class member's additional risks of non-recovery if Rule 23 certification is denied, state law claims are preempted, and/or extinguishment of their FLSA claims due to the running of the statute of limitations by not filing Consents to join the litigation; (iii) availability of potential liquidated damages under the FLSA and Kentucky Law but no such liquidated damages available under the OMFWSA; and (iv) weighting Set/Reset/Surge Team Members higher than Set/Reset/Surge Team Leaders to account for PLM's additional executive exemption arguments regarding the latter position. *Id.*, ¶ 30.

For the Kentucky Law and OMFWSA class claims, all members of the Kentucky Class or Ohio Class who are not currently members of the FLSA Collective were issued notice of their offered FLSA Payment amounts (50% of their total allocated individual amount) and State Law

Payment amounts (50% of their total allocated individual amount), notifying them of the right to object or to request exclusion from settlement, and notifying them that in order to accept their FLSA Payment check they will have to sign the endorsement language providing that acceptance constitutes opting in to the case as a plaintiff and releasing the Released FLSA Claims. *Id.*, ¶ 31. Because no absent class member timely excluded themselves from the settlement, each will automatically receive a check for 50% of their amount contained within Exhibit A to the Settlement Agreement from the Net Settlement Fund amount allocated to settlement of their state class claims as set forth in the Settlement Agreement, and a separate settlement check for their other 50% as the offered FLSA Payment bearing endorsement language stating that endorsing the FLSA Payment check constitutes opting in and accepting the FLSA Release. *Id.* This settlement therefore gives each absent class member the option to opt-in and accept the FLSA Payment check by signing endorsement accepting the FLSA Release, or decline the offered FLSA Payment and thus not release any FLSA claims. *Id.* Regardless of whether the absent class member accepts the FLSA Payment and releases FLSA claims, or declines the offered FLSA Payment and therefore does not release any FLSA claims, the absent class member will still receive their state law payment in exchange for the state law release imposed by final Rule 23 certification and settlement approval. *Id.* Thus, the settlement does not condition receipt of settlement payment for the release of state law claims on mandatory release of FLSA claims. *Id.*

The Settlement Agreement contains fair release terms that are limited in scope to the overtime claims at issue. *Id.*, ¶ 32. This settlement does not require a Class Member to give a general release of all claims (except, contingent on Court approval of Service Payments, the three named representative Plaintiffs who will give a general release in exchange for those Service Payments). *Id.* Consistent with the FLSA's opt-in (rather than opt-out) procedures under 29 U.S.C. § 216, the settlement also does not require a Class Member to release any FLSA claims unless the Class Member claims his or her individually offered additional FLSA payment in exchange for consenting to join the lawsuit and affirmatively accepting a release of FLSA claims. *Id.*

Thus, upon final approval, the Settlement Agreement will provide Plaintiffs with monetary consideration without the risk that they will recover nothing in this action or that any verdict will be overturned on motion or appeal by Defendants.

### III.    THE SETTLEMENT NOTICE PROCESS AFTER PRELIMINARY APPROVAL

On February 13, 2020, the Court granted the Plaintiffs' Motion for Unopposed Preliminary Approval of Class and Collective Action Settlement, conditionally certified FLSA Collective and State Law Class Settlement Classes, approved the distribution of notices to the Class Members, ordered that any requests for exclusion must be submitted within 45 days after issuance of notice, ordered that any written objections must be filed no later than twenty-one (21) days before the Final Approval Hearing, and set a Final Approval hearing for June 4, 2020 [ECF No. 95].

On March 5, 2020, the Settlement Administrator, RG/2 Claims Administration ("RG/2"), issued 211[2] notices to the Class Members by both U.S. Mail and email.  The Parties submit a Declaration from Melissa Baldwin at RG/2 verifying that the notices were distributed to the Class Members in the form and manner approved by the Court. (Declaration of Melissa Baldwin ("RG/2 Decl."), ¶ 13).

Prior to mailing the Notice Packets, and in order to locate the most recent addresses for Class Members, RG/2 Claims ran the Class data list of 211 names and addresses received from the Defendants through the United States Postal Service's National Change of Address database ("NCOA") and updated the records with any corrected information received. RG/2 Decl, ¶ 12. RG/2 Claims also incorporated any updated addresses for the Class Members received from Class Counsel. *Id.* As of May 15, 2020, seven (7) Notice Packets have been returned by the United States Postal Service ("USPS") as undeliverable.  *Id.*, at ¶ 17. Of the seven (7) returned Notice Packets, one (1) Notice Packet included a forwarding address provided by the USPS, and a new Notice Packet was promptly mailed to the Class Member. *Id.* For the remaining six (6) returned Notice Packets, RG/2 Claims performed extensive skip-trace procedures and was able to locate updated

---

[2] 162 notices were sent to FLSA collective members and 49 notices were sent to Kentucky and Ohio class members who did not previously opt-in to the lawsuit.

addresses for all six (6) Class Members. Again, new Notice Packets were promptly mailed to the Class Members. *Id.* Therefore, 100% of the Notice Packets mailed (and not having been returned) may be presumed as having been successfully delivered to the potential Class Members. *Id.*

In addition to mailed and emailed Notice, the Notice was published on the publicly accessible case settlement website maintained by the Settlement Administrator throughout the notice and claim period.[3] RG/2 Decl., ¶ 15. That website (i) provided a brief summary of the case and notice process; (ii) provided a link to download the Notice and Claim form; (iii) attached pertinent Court Documents including the Settlement Agreement and Order preliminarily approving settlement and setting the final approval hearing; (iv) provided answers to common questions on its "FAQs" page; and (v) included contact information for any questions. *Id.*

The Court-ordered deadline for timely filed exclusion was April 20, 2020. There were no requests for exclusion from any Class Member. The Court-ordered deadline for timely filed objections to the settlement was May 14, 2020. There were also no objections from any Class Member. *Id.*, at ¶¶ 18-19. Also, on November 8, 2019, Defendant served all required government officials with the notices required by the Class Action Fairness Act ("CAFA"). Head Decl., ¶ 36; Grisham Decl., ¶ 4. The 90 day period for those CAFA notice recipients to lodge objections to the settlement concluded, there have been no objections from any government officials in response to CAFA notices received to date, and the parties do not anticipate that any such objections will be lodged in this case. Head Decl., ¶ 36.

## IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THIS SETTLEMENT

### A. Approval Standard for FLSA Settlements

A district court should approve a FLSA collective action settlement if it was reached as a result of contested litigation and it is a fair and reasonable resolution of a bona fide dispute between the parties. (Order [ECF 95], p. 8) (*citing, inter alia, Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1355 (11th Cir. 1982)).

---

[3] https://www.rg2claims.com/plmarketing.html

Similarly, as to settlement of class action claims under Fed. R. Civ. P. 23, final approval of the proposed settlement is warranted if the Court finds the terms of the settlement are "fair, reasonable, and adequate." *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992). "Absent evidence of fraud or collusion, such settlements are not to be trifled with." *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989). The Sixth Circuit and its district courts recognize that the law favors the settlement of class action lawsuits. *Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) (public policy strongly favors settlement of complex litigation). The touchstone for final approval is the effect on the class as a whole in light of the particular circumstances, which include the public policy encouraging comprehensive settlement of class actions. *See Granada*, 962 F.2d at 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 910 (6th Cir. 1983).

B.  Approval Standard for Rule 23(e) Class Action Final Settlement Approval

A district court must find a settlement to be "fair, reasonable, and adequate" for it to be approved. *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (*quoting* Fed. R. Civ. P. 23(e)(1)(C)). The district court considers seven factors in making this finding:

> (1) the risk of fraud or collusion;
> (2) the complexity, expense and likely duration of the litigation;
> (3) the amount of discovery engaged in by the parties;
> (4) the likelihood of success on the merits;
> (5) the opinions of class counsel and class representatives;
> (6) the reaction of absent class members; and
> (7) the public interest.

*UAW*, 497 F.3d at 631. The district court has "wide discretion" to weigh these factors. *Granada*, 962 F.2d at 1205-06. While these  factors are helpful in guiding the analysis, the "fairness of each settlement turns in large part on  the bona fides of the parties' legal dispute," that is, whether there are real issues and risks in the case that would lead each party to opt toward settlement. *UAW*, 497 F.3d at 631.

In addition, the Court must ensure that the settlement notice process provides "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The Court previously approved the content of the Notices and Claim forms. (Order [ECF 95], p. 31) The

Notices provided potential Settlement Class Members information about the terms of the settlement, informed them about the allocation of attorney fees and costs and intent to seek approval for service payments, expert fees, and Settlement Administrator fees (including the specific amounts for each), and explained their right to object or exclude themselves from settlement. The Notices also provided potential members information regarding the date, time, and place of the Final Approval Hearing, as well as contact information for the Settlement Administrator and Class Counsel. And there can be no question that by delivering the Court-approved Notices via both direct U.S. Mail and by email, this settlement involved "the best notice that is practicable" by providing notice "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Feiertag v. DDP Holdings, LLC*, No. 14-CV-2643, 2016 U.S. Dist. LEXIS 122297, at *9 (S.D. Ohio Sep. 9, 2016) (finding notice providing similar information sent by U.S. Mail and by email satisfied "best notice" requirements) (*quoting UAW*, 497 F.3d 615, 629-30); *Wooten v. Smith & Nephew, Inc.*, No. 2:06-cv-02571-SMH-dkv, 2009 U.S. Dist. LEXIS 130317, * 5-6 (W.D. Tenn. Nov. 25, 2009) (Mays, J) (finding that "dissemination of the Notice as provided in the Preliminary Approval Order constituted the most effective and practicable notice…to all Settlement Class Members concerning the pendency of this action, the proposed Settlement, and the fairness hearing, and constituted due and sufficient notice…").

  C. <u>The Court Properly Certified the Settlement Classes</u>

  Following preliminary approval, the class action is presumed to be reasonable, and "an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." *Manjunath A. Gokare, P.C. v. Fed. Express Corp.,* No. 2:11-CV-2131-JTF-CGC 2013 U.S. Dist. LEXIS 203546, *22 (W.D. Tenn. Nov. 22, 2013) (citations omitted). Again, there were no objections to this settlement by any class member or government official in response to CAFA notices.

  For the reasons set forth in the Plaintiff's motion for preliminary approval, and as ordered by the Court in granting preliminary approval, the Settlement Class was properly certified due to

the Parties' satisfactory demonstration of numerosity, commonality, typicality, adequacy of representation by Class Counsel, predominance, and superiority.

The Court also decides final certification of the FLSA collective action at the final approval stage. Final certification for settlement purposes is proper in this action, because the STMs and STLs are similarly situated, they worked the same shifts completing the same project of setting/resetting Kroger grocery store shelves, they were paid the same way at all times related to their claims (salary but with no overtime pay), they were all classified and paid by Defendant as exempt during the claim periods at issue, and they were all subject to the same policy of not paying overtime premiums. *See generally Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 746 (6th Cir. 2019) (affirming final certification of FLSA collective action including two different job titles where claims arose from a common policy of not paying overtime, both groups performed tasks were similar, and both groups worked the same times).

D.  The Settlement Far Exceeds the Requirements for Final Approval.

1.  *The Settlement Resolved Bona Fide Disputes in Adversarial Litigation.*

While the Court reviews a settlement for fairness based on the bona fides of the parties' legal dispute, this does not mean that the court should "decide whether one side is right or even whether one side has the better of these arguments. . . .The question is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632. Defendants denied the material allegations of Plaintiffs' claims and any violation of the FLSA, Kentucky Law, or Ohio Law, and they vigorously defended their position throughout the litigation and settlement negotiations. *See, e.g., Osman v. Grube, Inc.*, No. 3:16-cv-00802-JJH, 2018 U.S. Dist. LEXIS 78222, at *3 (N.D. Ohio May 4, 2018).

The parties had, among others, four interwoven legal-factual disputes: (1) whether the primary job duties of STMs and STLs were similar enough to satisfy the standards for final collective certification and class certification; (2) whether the decision to classify STMs and/or STLs as exempt was proper or improper; (3) whether Defendant made its classification decisions

in good faith (sufficient to deny liquidated damages) or willfully (required for the FLSA's statute of limitations to extend from two years to three years); and (4) even if liability is established, what the proper measurement of damages is in an overtime exemption case alleging misclassification – i.e., whether there is a time and half or a half time multiplier, and whether that multiplier applies to a regular rate determined by dividing weekly pay by all hours worked (as Defendant contends) or instead that multiplier applies to the rate paid for non-overtime hours worked (weekly salary divided by 40 hours). If this case was not resolved by settlement and continued to be litigated through summary judgment motions, decertification/class action certification motions, trial, and appeals, there is no guarantee Plaintiffs would have prevailed on these disputes. Thus, the settlement resolves a "bona fide dispute" in a litigated civil action.

Finally, the Parties reached settlement only with the assistance of an experienced mediator, and only after two separate full day mediations over a period of years.

### 2. *The Settlement Was Not the Product of Fraud or Collusion*

There is a "presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands." *UAW*, 497 F.3d at 628; *see also Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010) ("Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary.").

There was no fraud or collusion in reaching the Settlement. Settlement negotiations were extensive, conducted fairly by experienced counsel, and at arm's-length with the assistance of an exceedingly experienced mediator, and the settlement only occurred after the exchange and analysis of ample data necessary to make an informed evaluation of the strengths and weaknesses of each party's claims and defenses. Head Decl., ¶¶ 22-25; *see Manjunath A. Gokare, P.C. v. Fed. Express Corp.,* 2013 U.S. Dist. LEXIS 203546 at *11 (W.D. Tenn. Nov. 22, 2013) ("The participation of an independent mediator in the settlement negotiations virtually assures that the negotiations were conducted at arm's length and without collusion between the parties.") (*citing Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007)). Courts respect the integrity of

counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered. *Id.* There can be no doubt that in reaching this substantial Settlement, there has not been, and there could not be, been, the slightest suggestion of collusion – indeed, no one has objected to the  Settlement or otherwise "made the case that the agreement is a product of collusion." *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (citing *Williams v. Vukovich*, 720 F.2d 909,  921 (6th Cir. 1983))).

### 3.  *The Complexity, Expense, and Likely Duration of Litigation Supports Approval*

"FLSA claims typically involve complex mixed questions of fact and law." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). The FLSA and state wage and hour law claims and defenses are complex (*see* Section IV(D)(1), supra); litigating those disputed claims, defenses, and procedural issues would be both difficult and time-consuming. Recovery by any other means would have required years of additional litigation, trial and appeals of this action, along with the potential for decertification or class certification denial resulting in separately filed actions each involving their own summary judgment motions, trials, and appeals. *See United States v. Glens Falls Newspapers, Inc.*, 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial").

### 4.  *The Parties Conducted Sufficient Discovery to Determine Litigation Risks*

In this case, the Parties engaged in extensive informal discovery before engaging in mediation and settlement negotiations. (Order [ECF 95], p. 15 ("The parties engaged in extensive fact and expert discovery.")) There has been adequate discovery to satisfy that *Granada* factor – "[f]ormal discovery is not required." *In re Regions Morgan Keegan Secs*, No. 2:11-cv-02935-SHM, 2013 U.S. Dist. LEXIS 205822, at *19 (W.D. Tenn. Sep. 5, 2013). Plaintiffs and Class Counsel conducted extensive investigations into the facts before and during the prosecution of this case, which investigations included multiple meetings and conferences with the Plaintiffs and opt-in Plaintiffs; analysis of payroll and other documents produced to Class Counsel by its clients;

analysis of complete payroll records and documents regarding time recorded as worked by each of the opt-in STMs and STLs in the Kroger stores which they were only required to record for approximately thirteen months of the maximum three-year lookback recovery periods until the December2016 reclassification and were only recorded as to their in-store hours worked, documents regarding time recorded by the STMs after the December, 2016 reclassification, which included data of compensable travel time recorded as worked and paid by Defendant, payroll records, including mileage reimbursement, car allowance, and bonuses for each of the opt-in plaintiffs for the entire relevant time period, and mileage reimbursement records for the named Plaintiff and each of the opt-in Plaintiffs who opted-in prior to notice; individualized damages calculations; analysis of Defendants' legal positions; investigation into the viability of class and collective action treatment; and extensive analysis of potential class-wide damages. Head Decl., ¶¶ 20-21; *see Mitchell*, 2019 U.S. Dist. LEXIS 26464, at *10-11 (finding record of such investigation "demonstrates that both parties have been afforded an adequate opportunity to conduct sufficient discovery to be fully appraised of the legal and factual issues presented as well as the strengths and weaknesses of their cases[; b]oth sides made well-informed decisions to enter into the Settlement[; and t]his factor weighs in favor of approving the proposed Settlement.")

### 5. *Likelihood of Success on the Merits Supports Final Approval*

"The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir. 1984). From Plaintiff's perspective, there were risks in nearly every aspect of the case, as summarized above in Section IV(D)(1).

First, there were risks as to Rule 23 certification of the Kentucky and Ohio state law class actions, and risks of decertification of the FLSA collective action. The loss of the collective and class mechanisms would have (i) eliminated the Plaintiffs' opportunity to spread the substantial litigation expenses needed to take the case to trial across the collective and class members, and (ii) negatively affected the substantial bargaining power Plaintiffs would have to bring the

case to final settlement and to curtail additional litigation. Thus, Plaintiffs could have prevailed on their individual cases, but lost the class/collective certification battle, which would have had a series of direct negative consequences for them and the class of individuals slated to receive the benefits of this settlement - such as members of any decertified collective, for example, deciding not to pursue their individual claims after decertification.

Second, a trial on the merits would involve significant risks as to liability. The circumstances in *Thomas v. Speedway SuperAmerica, LLC*, illustrate the challenges of pursuing claims under the executive exemption. 506 F.3d 496, 504-09 (6th Cir. 2007). In that case, the district court granted summary judgment to the defendant on the grounds that plaintiff, a convenience store manager, was properly classified as exempt under the bona fide executive exemption, and the Sixth Circuit affirmed, despite the plaintiff's compelling argument that managers performed extensive non-managerial tasks.   *Thomas*, 506 F.3d at 504-09. Other employers in this Circuit have similarly succeeded in establishing their exemption defenses after protracted litigation. *See Henry v. Quicken Loans, Inc.*, 698 F.3d 897,  902 (6th Cir. 2012) (after eight years of litigation, affirming jury verdict that mortgage bankers  were properly classified as exempt from overtime under the FLSA); *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 650-51 (6th Cir. 2013) (affirming exempt status for special investigators following bench trial and five years of litigation). Although Plaintiff believes these cases are distinguishable from the facts and legal arguments at issue in this case, the potential litigation risk is undeniable.

Third, as summarized in Section IV(D)(1) above, even if liability could be established, uncertainties exist as to the fact and amount of damages. Damages – and the method of calculating them both as a matter of fact and also as a matter of law – would have been hotly disputed as they were during negotiations, and if Defendant's preferred "fluctuating workweek"-type half-time calculation method was accepted, the damages value would be reduced to approximately one-third of Defendant's damages exposure under Plaintiffs' preferred calculation method. In addition, at trial, Plaintiffs would have to prove willfulness in order to obtain a third year of liability for damages, and establish that the Class Members worked over 40 hours a week while overcoming

Defendant's defenses regarding the accuracy of their estimated hours worked complicated by the limited recorded hours worked and amounts of recorded travel time.

Courts have recognized in exemption misclassification cases similar to this one, "[i]t is undisputed that copious risks abound with respect to maintaining this action and establishing liability." *Craig v. Rite Aid Corp.*, No. 4:08-cv-2317, 2013 U.S. Dist. LEXIS 2658, at *38 (M.D. Pa. Jan. 7, 2013). So too in this case.

Here, as set forth in Class Counsel's Declarations, Plaintiffs and Class Counsel contend that this settlement is an outstanding result for the Class Members. (Head Decl., ¶¶ 26-37)[4] But even the possibility that the class "might have received more if the case had been fully litigated is no reason not to approve the settlement." *Granada*, 962 F.2d at 1206 (quotation omitted). Where a proposed settlement provides for relief now, rather than some years down the road, it is proper for the parties "to take the bird in the hand instead of a prospective flock in the bush." *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974).

6. *The Opinions of Class Counsel and Parties Support Final Approval*

The Parties were represented by competent, experienced counsel with extensive experience in wage and hour class and collective action litigation. Head Decl., ¶¶ 4-16. Over decades of litigation experience, Class Counsel has prevailed – and, unfortunately on occasion, suffered defeat – in litigating many such cases on behalf of their clients, putting them in a strong position to weigh the strengths and weaknesses of the claims in this case. *Id.*, at ¶¶ 5-14. Counsel for the parties, having thoroughly vetted the legal, factual, and evidentiary issues in this case, recommend approval of this settlement. "In deciding whether a proposed settlement warrants approval, the informed and reasoned judgment of plaintiffs' counsel and their weighing of the relative risks and

---

[4] This settlement involves a per-person net recovery that compares favorably to other Court-approved "merchandiser" overtime class and collective action settlements. (Head Decl., ¶ 37) (citing *Cikra v. LaMi Products, LLC*, No. 2:15-cv-06166-WB [ECF #50] (E.D. Pa. Nov. 10, 2016) (approving $1,550,000 "merchandiser" overtime class and collective action settlement offering the gross average amount of $603.11 per each of 2,570 class members)).

benefits of protracted litigation are entitled to great deference." *In re Regions Morgan Keegan Secs*, 2013 U.S. Dist. LEXIS 205822, at *21 (citation omitted).

The Parties[5] and their respective counsel agree that this settlement is fair, reasonable, and deserving of final approval. "Under governing law, their judgment is a factor that weights strongly in favor of approval of the Settlement." *Id.; see also Garland v. Memphis-Shelby Cnty. Airport Auth.*, No. 09-2749, 2011 U.S. Dist. LEXIS 159344, *13 (W.D. Tenn. July 19, 2011) (granting final approval after noting that counsel "are experienced and respected trial lawyers. They support the Agreement.").

### 7.    *The Positive Reaction of Class Members Supports Final Approval*

There were no requests for exclusion filed within the Court-ordered period ending April 16, 2020, or any objections filed by the deadline set in the Preliminary Approval Order of May 14, 2020. RG/2 Decl. ¶¶ 18-19. Moreover, as noted, no government official recipient of CAFA settlement notices objected or voiced any disapproval whatsoever of the Settlement. Head Decl, ¶ 36; *see, e.g.*, *Hall v. Bank of Am., N.A.*, No. 1:12-CV-22700-FAM, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014) ("[T]he Court considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness."). This factor supports final approval.

### 8.    *Public Interest and CAFA Compliance*

"Class actions are meant to serve the public interest by providing an incentive for lawyers and class representatives to litigate on behalf of a group of people whose injury is legitimate and meaningful, but whose individual damages are not substantial enough to make litigation on an individual basis worthwhile." *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 782 (N.D. Ohio 2010). In filing this case, Plaintiff and Class Counsel "took on a difficult case that an individual Class Member would almost certainly never file on their own" and "obtained recovery

---

[5] *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-cv-436, 2014 U.S. Dist. LEXIS 46846, at *54 (S.D. Ohio Apr. 4, 2014) ("Not insignificantly, the Class Representatives have also approved the Settlement Agreement.")

on a class-wide basis for an alleged injury that, but for this litigation, would almost certainly have gone uncompensated." *Id.* As a result, the substantial judicial resources that would need to be used to resolve this dispute can now be redirected toward other public ends.

Under CAFA, "[a]n order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b)]." 28 U.S.C. § 1715(d). On November 8, 2019, within ten days of the filing of Plaintiffs' preliminary approval motion, Defendant served all required government officials with the notices required by the Class Action Fairness Act ("CAFA"). Head Decl., ¶ 36. The 90 day period for those CAFA notice recipients to lodge objections to the settlement concluded, there have been no objections from any government officials in response to CAFA notices received to date, and the parties do not anticipate that any such objections will be lodged in this case. *Id.*

<u>**CONCLUSION**</u>

For the reasons stated above and as recognized by the Court in granting preliminary approval of this settlement, the Parties respectfully request that the Court enter the Final Order entering stipulated judgment filed with this joint motion for final approval.

Respectfully submitted,

*/s/ C. Andrew Head*
C. Andrew Head
Bethany A. Hilbert
Head Law Firm, LLC
4422 N Ravenswood Ave
Chicago, IL  60640
(404) 924-4151; (404) 796-7338  (Fax)
ahead@headlawfirm.com
bhilbert@headlawfirm.com

*Attorneys for Plaintiffs and the*
*Class/Collective*

## CERTIFICATE OF CONSULTATION

I hereby certify under Local Rule 7.2(a)(1)(B) that as reflected by counsel's signature approving as to form the parties' Settlement Agreement, and multiple communications with Defendant's counsel Jeff Weintraub including telephone and email communications regarding the settlement of this action and settlement approval, I have consulted with Defendant's counsel and Defendant is in agreement with the action (final approval of class/collective action settlement and settlement-purposes certification of Rule 23 settlement classes) requested by this motion.

*/s/ C. Andrew Head*
C. Andrew Head

*One of the Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing has been electronically filed with the United States District Court for the Western District of Tennessee on this 15th day of May, 2020.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


<u>*/s/ C. Andrew Head*</u>
C. Andrew Head

*One of the Attorneys for Plaintiffs*